UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TALBOT TIDWELL,  )
  )
    Plaintiff,  )
  )
vs.  )  Case No. 4:13-CV-1032 (CEJ)
  )
CAROLYN W. COLVIN,[1] Acting  )
Commissioner of Social Security,  )
  )
    Defendant.  )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On October 16, 2009,[2] plaintiff Talbott Tidwell filed applications for a period of disability, disability insurance, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of January 1, 2003, which was subsequently amended to January 1, 2009. (Tr. 219-27, 257). After plaintiff's applications were denied on initial consideration (Tr. 120-23), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 135).

Plaintiff and counsel appeared for a hearing on April 28, 2011. (Tr. 36-66). The ALJ issued a decision denying plaintiff's applications on March 8, 2012.[3] (Tr. 14-33).

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), she is substituted for Michael J. Astrue as the defendant in this case.

[2]The record contains two earlier applications, filed on February 15, 2006 and March 26, 2008, (Tr. 200-08, 209-18) that were denied on initial consideration. (Tr. 71-72, 76-78).

[3]The ALJ initially denied benefits on September 12, 2011, based in part on an incorrect determination that plaintiff failed to attend a post-hearing psychological evaluation. See Tr. 84-99 (ALJ hearing decision); 197-99 (representative

The Appeals Council denied plaintiff's request for review on March 26, 2013. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

Plaintiff completed Disability Reports in 2006, 2008, and 2009. (Tr. 268-75, 293-99, 355-62). He listed his disabling conditions as learning disabilities, unspecified hearing problems, allergies, borderline diabetes, and poor eyesight. He stated that he was able to read at the third-grade level and perform math at the second-grade level. (Tr. 269). He also stated that he would "go[] off into his own little world," and that it could take several minutes to get his attention. (Tr. 294). He stated that he needed somebody with him at all times to help him with his jobs. (Tr. 356). He took medication to control his blood pressure. (Tr. 272).

Plaintiff completed a Function Report in 2006. (Tr. 285-92). He stated that he spent his waking hours looking for a job. He could pay bills and count change, but could not manage a bank account. He identified his areas of difficulty as understanding and getting along with others. In 2008, he completed the Missouri Supplemental Questionnaire, with the help of a Social Security claims representative. (Tr. 307-14). He identified reading, math, and memory as his areas of difficulty. He stated that he did not play games or watch television.

Plaintiff's mother and sister completed Third-Party Function Reports in 2008. (Tr. 316-26, 330-37). Plaintiff lived in a boarding hotel at that time and did not drive. His mother drove him to stores, appointments, and to look for jobs. They reported that plaintiff was able to prepare simple meals for himself and, with time and

---

correspondence). The ALJ withdrew the September 2011 decision and referred plaintiff for another evaluation. See Tr. 17-18 (ALJ's explanation of procedural history).

reminders, could complete mowing and household repairs. He could pay bills, count change, and handle a bank account. He could not read written instructions and was "fair" at following spoken instructions. Mrs. Tidwell identified her son's areas of difficulty as hearing, completing tasks, and getting along with others. Plaintiff's sister saw him three or four times a week when she took him to see his probation officer and counselor. She stated that plaintiff sat around and slept and was depressed; she also said, however, that he cooked himself full-course meals every day. He was capable of managing household chores, including mowing, laundry, and cleaning. As to his ability to handle money, plaintiff's sister thought he "messed up" counting change and was unable to manage bank accounts. In addition to the problem areas identified by his mother, plaintiff's sister stated that he had difficulties with understanding, following instructions, reaching, memory, concentration, and handling stress and changes in routine. Plaintiff's mother completed another Function Report in December 2009. (Tr. 366-73). She described plaintiff as "walk[ing] all day with his head cut off" and stated that sometimes he was mad at the world. She also stated that he had "fears of people."

**B. Hearing on April 28, 2011**

Plaintiff was 36 years old at the time of the hearing. He received special education services throughout his school years and graduated from high school. He was living with a friend in exchange for his food stamps. He had never been married. (Tr. 47-48). He had never had a driver's license, though he was in the process of trying to get one at the time of the hearing. Plaintiff testified that he is barely able to read a newspaper, cannot read menus, and had to have the motor vehicle license test read to him. (Tr. 49). He can write his name but not his address and needs help filling out forms.

Plaintiff last worked at a McDonald's restaurant. He generally spent 5 hours out of every 8-hour shift cleaning the building and picking up the grounds, and three hours cooking. (Tr. 51). He testified that he was fired for not disclosing his prior felony conviction on the job application. However, plaintiff testified that the omission was accidental as he did not see the question on the application. (Tr. 52). Plaintiff worked as custodian for the Meramec County school district from 1990 until 2002 when he was fired after being convicted of a felony. Plaintiff was incarcerated in the Franklin County jail for a period of time. Id. He was arrested again in June 2010 and was incarcerated for 8 months. (Tr. 56).

Plaintiff testified that he had no physical impairments that kept him from working. He had difficulty with reading, writing, memory and concentration, and got angry when people corrected him. (Tr. 53-54). He was able to cook and clean, but needed help with grocery shopping because he could not read labels. (Tr. 57). He agreed that he had mood swings --after the term was defined for him -- and he did not like being in crowds. He used to see a counselor before he went to jail and planned to start again because his probation officer wanted him to do so. He thought he would be on probation for another 5 years.

James E. Israel, M.Ed, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and work experience, who had no exertional limitations; who was limited to occupations that do not require written communication; involve only simple, routine, repetitive tasks; and require only occasional decision-making. In addition, Mr. Israel was asked to assume that the individual could have no interaction with the public and only casual, infrequent contact with co-workers. Mr. Israel opined that such an individual would be able to perform work in three areas: cleaning; packing and wrapping; and assembly and

production. (Tr. 60-61). Mr. Israel was then asked to assume that the individual was restricted to jobs where production quotas were measured only at the end of the day, rather than on an hourly basis. This additional limitation reduced the total number of assembly and production jobs by 20%. If the individual were limited to jobs in which contact with a supervisor was limited to no more than once a day, the available jobs in all areas decreased by 10%. Mr. Israel opined that there were no jobs available for an individual who could not engage in any decision-making. On examination by plaintiff's counsel, Mr. Israel opined that the identified jobs can be performed by someone who is not literate. (Tr. 64-65).

### C. Records

The records reflect that plaintiff received special education services starting in kindergarten. A psychological evaluation in March 1980, when he was 5 years old, showed delays in cognitive development. (Tr. 433). It was noted that plaintiff had a serious brain infection when he was 3 years old.[4] Subsequently, he experienced epileptic seizures, for which he was taking medication, and he was thought to be mentally retarded. The examiner noted that plaintiff was unable to dress himself and had been observed to limp. (Tr. 435, 433). Tests of cognitive functioning placed plaintiff in the mild mental retardation range of intelligence, with relative weaknesses in general comprehension and verbal fluency. His conceptual maturity was considerably below age-level. (Tr. 435). A speech and language evaluation in second grade established that plaintiff did not know the alphabet, his birthday, or his home address and he could not write his name or re-tell a story. (Tr. 415). An

---

[4]In 2004, plaintiff's mother reported that he met normal developmental milestones but, at age 2, he struck his head and lost consciousness. He began having convulsions and thereafter he had to re-learn basic skills, such as walking. (Tr. 572).

Individualized Education Plan (IEP) created when plaintiff was 7 years old noted that he had a severe hearing loss in his right ear, weak fine motor skills, and walked with a limp. In addition, he had poor academic skills and needed speech and language therapy. (Tr. 408). In ninth grade, plaintiff's word recognition and spelling skills were below a third-grade level. (Tr. 418). His scores on the WISC-R were 58 for Verbal IQ, 69 for Performance IQ, and 60 for Full Scale IQ, and he was assessed to be in the educable mentally handicapped range. (Tr. 423). He was described as immature, overly dependent, and impulsive, with temper outbursts. In addition, he engaged in hitting and fighting, disobeyed rules, lied, had difficulty expressing himself and understanding directions, and gave up easily. (Tr. 422).

Plaintiff underwent a court-ordered competency examination in 2002 after he was charged with child molestation. (Tr. 561-67). Intelligence testing placed his cognitive abilities within the mild mental retardation range and it was determined that he lacked capacity to proceed in the criminal matter. He was committed to the Department of Mental Health and was held in custody at the St. Louis Psychiatric Rehabilitation Center from September 2004 until February 2005. Evaluators noted that plaintiff's immediate and recent memory were good, while his remote memory suffered due to his cognitive limitations. His insight was fair and his judgment was fairly good while in a structured setting. (Tr. 564). He generally complied with program rules and, overall, his behavior was appropriate and stable. (Tr. 565). When plaintiff learned that a finding of incompetence would result in his remaining in the hospital for a period of time, he expressed a desire to be found competent; his ability to remember court-related information improved thereafter. Id. At discharge, his diagnoses were

query paraphelia, possible alcohol abuse, and mild mental retardation; his Global Assessment of Functioning score was 45.[5] (Tr. 566).

On December 17, 2009, plaintiff underwent an outpatient mental health assessment. (Tr. 545-49). He reported that he had been jailed for four years after "accidentally" pleading guilty to molestation. He used alcohol heavily when younger, but stopped in 2002 after a serious car accident. After a recent job loss, he experienced depression and suicidal thoughts. He reported that he experienced crying spells, a desire to be alone, difficulty sleeping, and agitation. He had ongoing fears that someone would break into his home and hurt him and he covered his windows with black garbage bags. These symptoms were better if he remained busy. He did volunteer work at the Humane Society and had been the sole caregiver for his grandmother while she was ill. At the time of the evaluation, plaintiff was oriented, was able to demonstrate abstract thought, and his judgment was intact. He demonstrated organized thought content and normal speech patterns. He maintained good eye contact. He appeared to be of normal intellect. He was diagnosed with major depressive disorder, recurrent, severe; generalized anxiety disorder; bipolar disorder as a rule-out diagnosis; and alcohol dependence in remission. His GAF on admission was 60.[6] He was not diagnosed with mental retardation. (Tr. 550).

---

[5]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[6]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

The record contains three Mental Residual Functional Capacity Assessments. In 2006, Stanley Hutson, Ph.D., found that plaintiff's mild mental retardation limited his judgment and decision making, but that he made an effort in work with appropriate reactions to supervision. He could follow simple instructions and would be able to do simple work in a setting that had no contact with juveniles. Dr. Hutson noted that plaintiff had previously worked a routine job and there was no indication that he experienced a decline in ability. (Tr. 69). In 2008, Glen D. Frisch, M.D., also found that plaintiff had the capacity to understand, remember, and carry out simple instructions; to maintain adequate attendance and sustain an ordinary routine without undue supervision; interact appropriately with peers and supervisors; and adapt to minor changes in a simple work setting. (Tr. 75). In 2010, Marsha Toll, Psy.D., similarly found that plaintiff had only insignificant or moderate limitations in his mental capacities. (Tr. 79-81).

Arjun Bhattacharya, M.D., completed a consultative internal medicine evaluation on January 27, 2010. (Tr. 508-10). There were no significant physical findings on examination.

Paul W. Rexroat, Ph.D., completed a consultative evaluation of plaintiff on December 11, 2011. (Tr. 627-37). On examination, Dr. Rexroat found that plaintiff was slightly anxious and slightly tense. He exhibited a normal range of emotional responsiveness with a slightly flat affect. There was no evidence of a thought disorder. Plaintiff reported occasional mood swings, with bouts of depression off and on for years. Medication reduced his depressive symptoms. Dr. Rexroat administered the Wechser Adult Intelligence Scale – IV (WAIS-IV), and determined that plaintiff's Full Scale IQ was 65, which placed him in the mild mental retardation range of intelligence. (Tr. 633). His verbal reasoning abilities were significantly weaker than his nonverbal

reasoning skills. Dr. Rexroat found that plaintiff was able to understand and remember simple instructions, sustain concentration and persistence with simple tasks, and interact socially. He was not able to manage his own funds.

### III. The ALJ's Decision

In the decision issued on March 8, 2012, the ALJ made the following findings:

1. Plaintiff met the insured status requirements through March 31, 2009.

2. Plaintiff has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date.

3. Plaintiff has the following severe impairments: major depressive disorder and borderline intellectual functioning.

4. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: he is limited to occupations that do not require written communication and involve only simple, routine and repetitive tasks, with end-of-workday quotas. In addition, he is limited to low stress jobs requiring only occasional decision-making and only occasional changes in the work setting, with only casual and infrequent contact with coworkers, and contact with supervisors occurring only once a workday.

6. Plaintiff is unable to perform his past relevant work.

7. Plaintiff was 34 years old, a younger individual, on the alleged disability date.

8. Plaintiff has at least a high school education with special education services and is able to communicate in English. However, he is essentially illiterate.

9. Transferability of job skills is not material because using the Medical-Vocational Rules as a framework supports a finding of "not disabled" whether or not plaintiff has transferable job skills.

10. Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from January 1, 2009, through the date of the decision.

(Tr. 20-26).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of

disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ erred at Step 3 in failing to find that his impairments meet or medically equal the listing for mental retardation, Listing 12.05C.

The introductory paragraph for Listing 12.05 states:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The requirements in the introductory paragraph are mandatory. Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). Those requirements clearly include demonstrating that the claimant suffers "deficits in adaptive functioning" and that those deficits "initially manifest during the developmental period [before age 22]." Cheatum v. Astrue, 388 F. App'x 574, 576 (8th Cir. 2010) (alteration in original).

Plaintiff must also satisfy the additional severity "requirements of A, B, C or D." Plaintiff asserts he meets the criteria of C, which requires: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

Citing Dr. Rexroat's report from 2011, the ALJ found that plaintiff's IQ score and depression satisfied the requirements of paragraph C. (Tr. 20). However, the ALJ found that plaintiff failed to establish deficits in adaptive functioning, as required to satisfy the introductory paragraph:

> The claimant "successfully" engaged in substantial gainful activity for several years. Therefore, the claimant has demonstrated the absences of deficits with respect to work pace, social interaction, following instructions, working with supervisors and following rules and regulations. Therefore, the claimant fails his burden of presenting persuasive evidence of deficits in adaptive functioning.

Id.

Plaintiff argues that his school records establish that he had deficits in adaptive functioning before age 22. However, the record also establishes that he subsequently

developed the capacity to function well in a work setting. See Quarles v. Colvin, No. 4:11CV1854 TCM, 2013 WL 1197115 at *18 (Mar. 25, 2013) (discussing evidence before the ALJ that showed plaintiff's increased abilities). As the ALJ noted, plaintiff worked as a school custodian between 1990 and 2002, ending his employment only when criminal charges disqualified him. Similarly, after his release from detention, he worked doing cooking and cleaning at a fast-food restaurant for several months until it was learned that he had a felony conviction. There is no reason to believe that plaintiff would not have continued to function well in those positions if he were not legally disqualified from working in those settings. Further evidence of plaintiff's adaptive functioning is found in his volunteer work at Harmony House and the Humane Society and his ability to act as the sole caregiver for his grandmother. (Tr. 24-25, 546). Finally, plaintiff told Dr. Rexroat that he got along well with others and did his own cooking, cleaning, and grocery shopping. See Cheatum, 388 Fed. Appx. at 576-77 (claimant unable to satisfy listing 12.05C where she helped prepare meals and cared for her father).

Plaintiff argues that the court cannot uphold the ALJ's decision by citing factors not relied on by the ALJ, citing Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001), as support. Plaintiff's reliance is misplaced. "[A] reviewing court may not uphold an agency decision based on reasons not articulated by the agency," when "the agency [has] fail[ed] to make a necessary determination of fact or policy" upon which the court's alternative basis is premised. Id. (alterations in original; citation omitted). Here, the ALJ made the necessary factual findings to support the conclusion that plaintiff did not suffer from adaptive limitations. See id. ("Our review of the ALJ's decision . . . reveals that the ALJ did in fact make the factual findings necessary for the district court's alternative holding. Thus, the general limitation on a reviewing court's

ability to use reasons not utilized by the agency is not applicable to this case.")

Evidence in the record as a whole supports the conclusion that plaintiff's impairments do not meet or medically equal Listing 12.05C.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 25th day of August, 2014.